# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 19-22065-CIV-SMITH

REHAB AUF,

     Plaintiff,

v.

HOWARD UNIVERSITY, *et al.*,

     Defendants.

_____/

### <u>OMNIBUS ORDER</u>

This matter is before the Court on the following motions: the Motion to Vacate Entry of Default [DE 26] filed by Dr. Edna Medford, Dr. Anthony Wutoh, Dr. Wayne Frederick, and Dr. Robert Catchings (collectively, the "Individual Defendants"); the Motion to Dismiss Plaintiff's Amended Complaint [DE 28] filed by the Individual Defendants and Defendant Howard University (or the "University") (together with the Individual Defendants, "Defendants"); Plaintiff Dr. Rehab Auf's Motion for Leave to Conduct Jurisdictional and Service Discovery [DE 56]; and Plaintiff's Motion for Leave to Amend Complaint [DE 64]. For reasons discussed below, the Individual Defendants' Motion to Vacate Entry of Default is granted; Defendants' Motion to Dismiss Plaintiff's Amended Complaint is granted for lack of personal jurisdiction and improper venue; and Plaintiff's Motions to Conduct Jurisdictional Discovery and for Leave to Amend are denied. The Court does not dismiss the case, but rather transfers it to the District of Columbia pursuant to 28 U.S.C. § 1406(a).

## I. BACKGROUND[1]

This is a diversity action arising out of an employment-related dispute between Plaintiff and the Defendants regarding her termination from the University. (*See* Am. Compl. [DE 9].) The University is located in the District of Columbia (or D.C.). (*Id.* ¶ 6.) The Individual Defendants are employees of the University, and the Amended Complaint also provides a District of Columbia address for these defendants. (*Id.* ¶ 2-5.) Plaintiff resides in Miami, Florida. (*Id.* ¶ 1.)

### A. Allegations Giving Rise to Plaintiff's Claim

Plaintiff applied for a faculty position at the University in February 2018, and was interviewed between April and May 2018. (*Id.* ¶ 11.) Plaintiff was selected for the position and given a start date of August 16, 2018. (*Id.* ¶ 12.) However, Dr. Catchings, a Department Interim Chair at the University, and Dr. Medford, Interim Dean, did not send Plaintiff a final offer until August 1, 2019 — two weeks before her job start date. (*Id.*) Plaintiff accepted the offer in Miami and completed and returned the application form on August 2, 2018. (*Id.* ¶ 15.) The employment agreement detailed Plaintiff's financial compensation and provided that Plaintiff would be subject to a three-year probationary period, among other things. (*Id.*; Offer Ltr. [DE 51] at 1.)

The University Handbook states that an appointment is not final until a written notice of appointment has been sent by the president (or vice president, as appropriate) "to the candidate who, in turn, has returned a signed acceptance to the official who signed it." (Am. Compl. ¶ 16.) Even though Plaintiff sent several requests for the appointment letter and asked that the University allow her to start by the agreed August 2018 date, Dr. Medford and Dr. Frederick, President of the University, ignored Plaintiff's requests. (*Id.* ¶¶ 17-18.) On August 23, 2018, Dr. Medford

---

[1] The Court accepts all facts in the Amended Complaint as true. Exhibits cited in the Amended Complaint were not attached upon filing. To the extent they were otherwise filed with the Court and are material to the discussion, the Order provides the corresponding docket entry.

informed Plaintiff that her "appointment was approved" and the official letter would be sent shortly. (*Id.* ¶ 19.) Yet, Dr. Medford withheld the appointment letter. (*Id.* ¶ 20.)

On October 9, 2018, Dr. Medford sent Plaintiff a letter by email delaying her start date to January 2019. (*Id.* ¶ 19; Medford Ltr. [DE 51] at 5.) That same day, Dr. Medford also sent a letter stating:

> You were previously informed that you had been appointed to the position of Associate Professor (probationary) . . . at Howard University, with the appointment beginning on August 16, 2018. However, ***you did not complete the University's on-boarding process***, and did not appear for assigned classes at the beginning of the Fall 2018 semester. You still have not done so.
>
> . . . [As a result] your appointment start date has been changed . . . to January 1, 2019 . . . and you are required to report to campus to begin [teaching] duties on January 2, 2019.
>
> ***Please note that the attached appointment letter is the official and final notification of your appointment***. No further appointment documentation will be forthcoming. As of the writing of this letter, you have still not completed the University's onboarding process. You must do so prior to January 1, 2019. You are required to be on campus to begin spring semester on January 2, 2019. ***Failure to do so may be viewed as a neglect of your academic duties***.

(Medford Ltr. [DE 51] at 6 (emphasis added); Am. Compl. ¶¶ 21-22.) The letter was signed by Dr. Medford, and not the President, Dr. Frederick, and therefore, could not have constituted an appointment letter under the University's Handbook. (Am. Compl. ¶ 22.) Dr. Medford's letter was therefore misleading. (*Id.*)

On December 6, 2018, Plaintiff informed Dr. Catchings and Dr. Medford that she would arrive later than the required January 2, 2019, date and asked that the onboarding process be postponed until after her arrival on campus. (*Id.* ¶¶ 23-24.) Plaintiff received no objections and no warning about the consequences of such action. (*Id.* ¶ 23.) Later, Dr. Medford emailed Plaintiff and asked that she be on campus no later than January 14, 2019. (*Id.* ¶ 25.) Plaintiff arrived in D.C. by January 14, 2019, and attended the new faculty orientation. (Am. Compl. ¶¶ 25, 58.)

Despite her request and in violation of the offer letter, Dr. Catchings did not provide Plaintiff with an office space upon her arrival. (*Id*. ¶ 26.)

On January 16, 2019, the University's human resources department ("HR") emailed Plaintiff and asked that she "reapply" for her approved position to start the onboarding process. (*Id*. ¶ 27.) At that time, the University's website described the onboarding process as: starting when HR issues an offer to the candidate; proceeding when the candidate attends the new hire seminar; and ending when the new employee receives the first paycheck. (*Id*. ¶ 29.) Submitting an additional application was therefore not part of the process. (*Id*.) Hence, Plaintiff sought clarification about the onboarding process from Dr. Medford on December 7, 2018 and January 16, 2019, but Dr. Medford did not respond. (*Id*. ¶ 30.)

Finally, on January 17, 2019, an associate dean responded to Plaintiff and explained: "*I understand that the language of 'applying' for the position may be off-putting to you but please do follow through immediately with the online onboarding process*." (*Id*. ¶ 31 (emphasis in original).) The following day, the associate dean followed up with Plaintiff and explained that Dr. Medford did not see the need to speak with Plaintiff on this "entirely administrative issue." (*Id*.) Plaintiff did not feel that this response provided a proper justification for the apparent discrepancy between the onboarding process as it was described on the University's website and what was being required of her — especially since "reapplying" suggested the possibility that the University could accept or reject the application even after she had already reported for work. (*Id*. ¶¶ 31-33.) Therefore, Plaintiff "asserted her rights" and inquired further about the justification for steps she was being asked to take for onboarding. (*Id*. ¶ 34.) She reached out to Dr. Medford, Dr. Catchings, and two others but received no response. (*Id*.)

Having received no response, on February 6, 2019, Plaintiff went to meet with Dr. Medford. (*Id*. ¶ 35.) To Plaintiff's surprise, Dr. Medford indicated that a termination process might be initiated and that someone else has been teaching Plaintiff's class. (*Id*.) Dr. Medford instructed Plaintiff to meet with an attorney for the University "to resolve matters." (*Id*. ¶ 36.) The attorney was dismissive of Plaintiff, disrespectful, and ended the meeting. (*Id*.) On February 8, 2019, Plaintiff emailed Dr. Medford, explained her position, and asked that termination proceedings stop. (*Id*. ¶ 37.) Dr. Medford responded by stating that she had already submitted her recommendation to the Provost, Dr. Wutoh, that Plaintiff be terminated. (*Id*. ¶ 37.) Under the Handbook, the University had a duty to provide written explanation and give Plaintiff "an opportunity for informal adjustment" before initiating termination proceedings. (*Id*. ¶ 38-39.)

Dr. Wutoh sent Plaintiff a letter explaining the "reasons" termination proceedings had been initiated; specifically, for academic negligence. (*Id*. ¶ 40.) Dr. Wutoh asked Plaintiff to meet with him on February 14, 2019. (*Id*. ¶ 41.) It is unclear if Plaintiff went to the meeting but she did send a written defense of her position to Dr. Wutoh, explaining that Dr. Catchings had been unfair to her in the "assigning of academic duties" and requesting that procedures in the Handbook be followed prior to any termination proceedings. (*Id*.) On March 6, 2019, Dr. Wutoh sent Plaintiff a letter stating that Dr. Frederick, the President, made a preliminary decision to terminate her. (*Id*. ¶ 42.) Plaintiff continued to advocate her position, including the fact that she had not received an appointment letter from Dr. Frederick (as opposed to the one she received that was signed by Dr. Medford) and therefore, she never started working and could not be held liable for academic negligence. (*Id*. ¶¶ 43-44.) Plaintiff emailed Dr. Frederick, among others, but did not get a response. (*Id*. ¶ 45-47.) Plaintiff maintains that the University's failure to pay her during this time was a violation of the Handbook, which requires full pay until a final determination is reached on

termination. (*Id*. ¶ 46.) Overall, the University's failure to provide Plaintiff with a legitimate appointment letter precluded her from teaching. (*Id*. ¶ 52.)

Based on these allegations, Plaintiff asserts four counts in the Amended Complaint: "Ne[gligen]ce & Harassment" (Count 1, against all Defendants); "Fraud, Defraud, Conspiracy" (Count 2, against all Defendants); Vicarious Liability (Count 3, against Dr. Frederick, Dr. Wutoh, and the University); and Breach of Contract (Count 4, against the University). Plaintiff seeks reinstatement, loss wages with back and front pay, and an injunction to prevent retaliation.

**B. Procedural History**

Plaintiff filed a Complaint against Defendants on May 21, 2019, in the Southern District of Florida. (DE 1.) The Complaint was dismissed as a shotgun pleading by the prior judge. (Order [DE 7].) Plaintiff filed the Amended Complaint on May 24, 2019. A Clerk's Default was entered against the Individual Defendants on June 19, 2019. (DE 22.) On June 26, 2019, the Individual Defendants moved to vacate the entry of default. On July 5, 2019, Defendants moved to dismiss the Amended Complaint for lack of personal jurisdiction, improper service of process, improper venue, and failure to state a claim. Plaintiff's responses to the Motion to Vacate and the Motion to Dismiss were due on July 10, 2019 and July 19, 2019, respectively.

On July 10, 2019, Plaintiff asked for an additional twenty-one days to file her response to the Motion to Vacate (that is, until July 31, 2019) and requested that the deadline for her response to the Motion to Dismiss be enlarged to August 19, 2019. (DE 31.) The Court granted Plaintiff's motion in part and instructed her to respond to the motions by July 18, 2019 and August 9, 2019, respectively. (Order [DE 33].) On the date her response to the Motion to Vacate was once again due, Plaintiff filed a thirty-seven-page motion (*see* DE 35), seeking a stay of proceedings to allow the parties to submit to voluntary mediation before the U.S. Equal Employment Opportunity

Commission (EEOC), which Defendants were ultimately unwilling to do. The motion also asked the Court to vacate two of its orders and then meandered through other arguments. Defendants filed a response to Plaintiff's motion on August 1, 2019. (DE 39.) Plaintiff's reply was due on August 8, 2019.

On August 8, 2019, Plaintiff did not file a reply but rather moved for an extension of time. Plaintiff did not comply with the Local Rules and therefore, the motion was stricken. Plaintiff ultimately refiled the motion on September 9, 2019. (DE 47.) In the motion, Plaintiff explained that due to a medical condition, which was being exacerbated by the "stress" of litigation, she needed an enlargement of time up to September 30, 2019, to file her reply in support of her motion to stay. (*Id.* at 13.) The Court granted Plaintiff's motion and Plaintiff filed her reply on the deadline. In consideration of Plaintiff's reported medical condition, the Court entered no orders for approximately a three-month period.

On January 8, 2020, Plaintiff wrote to the Court, explaining that she was "at the edge of a complete and devastating turn of life unless [the Court] positively and urgently move[d her] case forward." (Not. of Correspondence [DE 54].) Plaintiff urged the Court to proceed with the case at the "soonest possible" time because of the imminent need for resolution. (*Id.*) Accordingly, the Court issued an order on January 10, 2020, denying the motion to stay and to vacate the Court's previous orders. (DE 53.) The Court instructed Plaintiff to respond to Defendants' Motion to Dismiss and Motion to Vacate no later than February 24, 2020, noting that: "The Court has been generous with the enlargement of time given to Plaintiff to formulate a response to these motions. No further extension of time will be granted." *Id.*

Notwithstanding her acknowledgement of the negative effect that may result from any further delay in the case, Plaintiff failed to file her response. Instead, on the deadline, Plaintiff

filed a motion seeking the undersigned's recusal (DE 55) and a Motion for Leave to Conduct Jurisdictional and Service Discovery (DE 56.) Plaintiff then moved to file a Second Amended Complaint. (*See* DE 64.) These motions are untimely, legally insufficient, and only serve the purpose of further delaying the Court's determination of jurisdictional issues raised in the Motion to Dismiss. The Court, therefore, proceeds to decide these potentially dispositive issues.[2] The Court will first address Defendants' Motion to Vacate Default, then the Motion to Dismiss, followed by Plaintiff's discovery motion and Motion for Leave to Amend Complaint, and then the issue of venue.

## II.     MOTION TO VACATE DEFAULT

"The court may set aside an entry of default for good cause." Fed. R. Civ. P. 55(c). There is a strong policy of determining cases on their merits and courts therefore view defaults with disfavor. *In re Worldwide Web Sys., Inc.*, 328 F.3d 1291, 1295 (11th Cir. 2003). In their motion, the Individual Defendants argue that the Clerk's Default should be vacated because of the jurisdictional issues discussed in the Motion to Dismiss and because they were not properly served. Plaintiff has indicated her opposition to the motion and maintains that the Individual Defendants were served.

The Individual Defendants' response to the Complaint was due on June 18, 2019. (DE 13.) At Plaintiff's request, a Clerk's Default was entered against the Individual Defendants on June 19, 2019. (DE 22.) The Individual Defendants filed the Motion to Vacate Entry of Default on June 26, 2019. The Court finds that good cause exists to vacate the entry of default. The Individual Defendants acted promptly to vacate the default, there is no prejudice to the Plaintiff if the motion

---

[2] While Plaintiff failed to file a response to Defendants' motions, the Court notes and considers her arguments in the record to the extent they are relevant. (*See, e.g.*, DE 57 & 32.)

is granted, and ultimately, as discussed below, the Court does not have personal jurisdiction over the Individual Defendants. *See Compania Interamericana Exp.-Imp., S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 951 (11th Cir. 1996) (listing some factors considered by courts in deciding whether to set aside an entry of default). The Motion to Vacate Entry of Default is granted.

## III. PERSONAL JURISDICTION

"Federal courts sitting in diversity undertake a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute, and (2) not violate the due process clause of the Fourteenth Amendment to the United States Constitution." *Bernardele v. Bonorino*, 608 F. Supp. 2d 1313, 1317 (S.D. Fla. 2009) (citing *United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1274-75 (11th Cir. 2009)). Determining whether jurisdiction is appropriate under Florida's Long-Arm Statute is a separate inquiry from determining whether exercising personal jurisdiction comports with the Due Process Clause. *Melgarejo v. Pycsa Panama, S.A.*, 537 F. App'x 852, 859 (11th Cir. 2013) (citation omitted). Therefore, if the requirements of the Long-Arm Statute are satisfied, the court must then determine whether the defendant has established sufficient "minimum contacts" with Florida, such that the exercise of jurisdiction over the defendant would not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945).

The plaintiff bears the initial burden of pleading sufficient material facts to make out a prima facie case of jurisdiction. *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000). If the plaintiff does so, the burden shifts to the defendant to contradict the plaintiff's allegations by affidavits or other competent evidence. *See Posner v. Essex Ins. Co.*, 178

F.3d 1209, 1214-15 (11th Cir. 1999). To the extent the defendant's proffered evidence does not contradict the plaintiff's jurisdictional allegations, the allegations must be accepted as true. *Id.* As explained in the analysis below, neither the Florida Long-Arm Statute nor constitutional due process is satisfied in this case. Therefore, the Court cannot exercise personal jurisdiction over the Defendants.

### A. Florida's Long-Arm Statute

"Florida's long-arm statute is to be strictly construed." *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996). Under the Long-Arm Statute, a court may exercise jurisdiction over a non-resident defendant in two ways: (1) a Florida court can exercise specific personal jurisdiction if the claim asserted against the defendant arises from the defendant's contacts with Florida, and those contacts fall within one of the enumerated categories set forth in section 48.193(1)(a); or (2) a Florida court can exercise general personal jurisdiction if the defendant engages in "substantial and not isolated activity" in Florida. *Thompson v. Carnival Corp.*, 174 F. Supp. 3d 1327, 1333 (S.D. Fla. 2016) (citation omitted). "[A] plaintiff seeking to subject a nonresident defendant to jurisdiction of the court through the long-arm statute must do more than allege facts that show a possibility of jurisdiction." *Bernardele*, 608 F. Supp. 2d at 1318 (citing *Lawson Cattle & Equip., Inc. v. Pasture Renovators LLC*, 139 Fed. App'x. 140, 142 (11th Cir. 2005)).

### i. Specific Jurisdiction

Plaintiff's Amended Complaint does not identify any of the enumerated categories under Florida's Long-Arm Statute that gives rise to specific personal jurisdiction over Defendants. Nonetheless, based on the factual allegations, the Court notes that the following enumerated categories conceivably could be invoked: (1) breaching a contract in Florida by failing to perform

acts required by the contract to be performed in Florida; (2) operating or conducting a business in Florida or having an office or agency in the state; and (3) committing a tortious act in Florida.[3] Fla. Stat. § 48.193(1)(a) (2020). The Court will consider each of these grounds.

## 1. Breach of contract and operating or conducting a business in Florida

Starting with the contract, allegations in the Amended Complaint do not support exercise of specific jurisdiction because performance was not to occur in Florida. The contract at issue is an employment agreement that required Plaintiff to teach classes at the University, which is located in the District of Columbia, and required the University to compensate Plaintiff for her services. Therefore, this prong of the Long-Arm Statute does not apply.

Similarly, there are no allegations to support a conclusion that Defendants (particularly the University) were operating or conducting business in Florida, or that the University has an office or agency in the state. "[T]o establish that a defendant is 'carrying on business' for the purposes of the long-arm statute, the activities of the defendant must be considered collectively and show a general course of business activity in the state for pecuniary benefit." *Future Tech. Today, Inc.*, 218 F.3d at 1249 (citation omitted). To determine if defendant's activities "show a general course of business activity," the Eleventh Circuit considers certain factors, such as "the presence and operation of an office in Florida, the possession and maintenance of a license to do business in

---

[3] To the extent the Amended Complaint asserts economic injury and physical "stress," the Court acknowledges that the Long-Arm Statute provides for specific jurisdiction over a non-resident defendant "causing injury to persons or property [in Florida] . . . if, at or about the time of the injury . . . [t]he defendant was engaged in solicitation or service activities [in Florida]." Fla. Stat. §48.193(1)(a)(6). However, "mere economic injury without accompanying personal injury or property injury does not confer personal jurisdiction over nonresident defendants," *Sculptchair, Inc.*, 94 F.3d at 629 (citation omitted), and Plaintiff has not sufficiently alleged a personal injury. Additionally, Plaintiff has not alleged that, at the time of her injury, Defendants were engaged in solicitation or service activities in Florida for purposes of the Long-Arm Statute. Therefore, specific jurisdiction does not exist under subsection (6).

Florida, the number of Florida clients served, and the percentage of overall revenue gleaned from Florida clients." *Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*, 421 F.3d 1162, 1167 (11th Cir. 2005) (internal citation omitted). The Amended Complaint does not allege any of these factors.

Plaintiff apparently bases her jurisdictional argument on allegations that, during the hiring process, Defendants called her and exchanged emails with her while she was in Miami, and she signed the offer letter in Miami (and emailed or mailed it back to Defendants in D.C.). (*See* Pl.'s Aff. & Case Law in Support of Personal Jurisdiction [DE 57] at 2-3.[4]) These allegations are insufficient to establish personal jurisdiction. The Eleventh Circuit's opinion in *Melgarejo*, 537 F. App'x at 854-61 is instructive. In that case, the plaintiff, a resident of Florida, filed suit against his non-resident employer alleging breach of contract. The plaintiff argued, among other things, that personal jurisdiction existed because his claims arose from an employment contract that was partially negotiated in Florida. *Id*. The Eleventh Circuit rejected plaintiff's argument and found that those facts were not enough to establish that the defendant conducted or carried on a business in Florida. *Id*. What is more, even if the defendant or its representative had visited Florida for the specific purpose of negotiating with plaintiff, the Eleventh Circuit "ha[d] no difficulty concluding that [defendant's] limited . . . activities fail[ed] to qualify as carrying on a business or business venture in Florida." *Id*. The court noted that during the relevant period, the defendant had no Florida business license, served no Florida clients, and thus did not glean any revenue from Florida clients. *Id*. And while the defendant shared an office with an affiliate in Miami, it "conducted only occasional and insignificant business operations" from that office, and there was nothing linking those business operations with the plaintiff's claim. *Id*.

---

[4] The document is titled "Affidavit" but is not a sworn statement.

This case is even further afield. There is not even an allegation that *any* of the Defendants visited Florida in connection with this employment contract. All communications took place over the phone or by email. Under Eleventh Circuit precedent, that is not enough to confer jurisdiction. *See Sculptchair*, 94 F.3d at 628 (holding that nonresident defendant was not "carrying on a business or business venture in Florida" when her only ties to Florida were "a series of telephone conversations with [the president of the plaintiff-company's] Florida office and a one-hour meeting to facilitate a contract to be performed wholly in Canada"); *see also Bernardele*, 608 F. at 1322 (holding that "the two meetings in Florida for the purpose of negotiating an agreement that was ultimately executed outside Florida and email communication into Florida cannot be found to constitute a general course of business activity in Florida for pecuniary benefit."); *Gulf Atl. Transp. Co. v. Offshore Tugs, Inc.*, 740 F. Supp. 823, 830-31 (M.D. Fla. 1990) (finding that defendants were not operating or conducting business in Florida where all performance under the towage agreement was in places other than Florida and even though plaintiff alleged that defendants called and sent messages to plaintiff in Florida, the contract was negotiated by telephone and accepted in Florida, defendants were involved in others business deals concerning Florida, and defendants were responsible for plaintiff's financial loss in Florida). Hence, § 48.193(1)(a)(1) and (7) are not grounds for specific personal jurisdiction in this case.

### 2. Committing a tortious act in Florida

Plaintiff alleges that Defendants were negligent. Her claim is based on allegations that Defendants neglected their duty to: (1) warn her of the consequences of arriving late on campus or of failing to complete the onboarding process; (2) timely provide a legitimate appointment letter or to advise her to remain in Miami until the letter was available; (3) clarify the onboarding process; (4) timely assign courses; (5) provide an opportunity for corrective measures before

initiating termination proceedings; (6) respond to her repeated requests for information and documents about the hiring and termination process; and (7) allow her the opportunity to work while termination proceedings were underway. (Am. Compl. ¶¶ 56-62.) These alleged duties of care all arose out Defendant's work in the District of Columbia. Defendants' conduct that amounts to a breach of these duties occurred in the District of Columbia and covers the time when Plaintiff had relocated to D.C. The duties and breach also pertain to teaching obligations in the District of Columbia. The Court fails to find a sufficient connection with Florida to warrant personal jurisdiction over the Defendants.

Concerning the "Fraud, Defraud, Conspiracy" Count, Plaintiff alleges that Defendants conspired to interfere with her work at the University and to deny her compensation. More specifically, Defendants: (1) withheld the appointment letter or deceitfully provided an appointment letter not signed by the President, Dr. Frederick; (2) assigned Plaintiff a course to teach in an untimely manner "to facilitate falsifying the academic negligence termination scenario"; and (3) seemingly conspired to create a basis for her termination by asking her to "reapply" as part of the onboarding process. (Am. Compl. ¶¶ 63-69.)

"A fraud claim lies for: (1) misrepresentation of material fact; (2) by someone who knew or should have known of the statement's falsity; (3) with intent that the representation would induce another to rely and act on it; and (4) injury suffered in justifiable reliance on the representation." *Zarrella v. Pac. Life Ins. Co.*, 755 F. Supp. 2d 1231, 1237 (S.D. Fla. 2011) (citation omitted). Claims based on fraud must be pled with particularity. Fed. R. Civ. P. 9(b). "Under Eleventh Circuit precedent, Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made . . . (2) the time and place of each such statement and the person responsible for making (or,

in the case of omissions, not making) [it] . . . (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Zarrella*, 755 F. Supp. 2d at 1236 (citing *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)).

"Civil conspiracy is not an independent cause of action; it is a liability spreading device based upon a viable underlying cause of action." *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1286 (S.D. Fla. 2003) (citation omitted). "The elements of civil conspiracy in Florida are: (1) an agreement between two or more parties; (2) to do an unlawful act; (3) doing an overt act to further the conspiracy; and (4) damage to the plaintiff as a result of the acts done under the conspiracy." *GolTV, Inc. v. Fox Sports Latin Am. Ltd.*, 277 F. Supp. 3d 1301, 1312-13 (S.D. Fla. 2017) (citation omitted). "Florida's long-arm statute supports personal jurisdiction over an alleged conspirator where any other co-conspirator commits an act in Florida in furtherance of the conspiracy, even if the defendant over whom personal jurisdiction is sought individually committed no act in, or had no relevant contact with, Florida." *Mazer*, 556 F.3d at 1281-82 (citation omitted). "'Conspiracy-imputed personal jurisdiction' requires that the formation of the conspiracy or the underlying tort upon which the civil conspiracy is predicated occur in Florida." *Diversified Mgmt. Sols., Inc. v. Control Sys. Research, Inc.*, No. 15-81062-CIV, 2016 WL 4256916, at *14 (S.D. Fla. May 16, 2016).

The Amended Complaint fails to sufficiently plead a claim for fraud or conspiracy and does not allege facts to support a conclusion that Defendants committed a tort in Florida that could give rise to a conspiracy claim. Instead, events such as the late course assignment and termination proceedings pertain to Defendants' conduct in D.C. — while Plaintiff was in D.C. Concerning the appointment letter, Plaintiff has not alleged any misrepresentation of material fact, let alone that

Defendants knew or should have known of the letter's falsity. The allegation that Dr. Medford signed the letter does not amount to an allegation of fraud. In fact, based on Plaintiff's allegations, the appointment letter was an official appointment letter. Consistent with being appointed to the faculty position, Plaintiff was expected to complete the onboarding process, Plaintiff was instructed to report for classes by a certain date, Plaintiff attended the new faculty seminar at the University, and Plaintiff was assigned courses. The letter also specifically warned that failure to meet the terms of the appointment letter (that is, requirements to complete onboarding and timely report for classes) could be viewed by the University as neglect of academic duties — requirements which Plaintiff failed to meet. Further, to support a fraud claim, Plaintiff has not alleged what Defendants obtained as a result of the fraud. In sum, Plaintiff has not pled a fraud claim that satisfies Rule 8 or Rule 9(b) and any purported conduct giving rise to such claim occurred in D.C.

Plaintiff also has not pled a civil conspiracy. First, no underlying tort has been alleged. Additionally, Plaintiff's allegations are merely conclusory. Based on the Defendants' individual alleged failures in carrying out their respective duties, Plaintiff infers that these "failures" were an orchestrated effort to "defraud" her. She provides no plausible factual basis for her belief. Neither has she alleged an agreement between the Defendants to commit an unlawful act nor identified any act committed in Florida by any of the Defendants in furtherance of the alleged scheme. Therefore, Plaintiff's allegations do not support exercise of personal jurisdiction over Defendants based on tortious acts committed in Florida. Specific jurisdiction does not exist.

### ii. General Jurisdiction

Under Florida's general jurisdiction provision, "a defendant who is engaged in substantial and not isolated activity within this state . . . is subject to the jurisdiction of the courts of this state." Fla. Stat. § 48.193(2). "The reach of this provision extends to the limits on personal jurisdiction imposed by the Due Process Clause of the Fourteenth Amendment." *Fraser v. Smith*, 594 F.3d

842, 846 (11th Cir. 2010) (citation omitted). "[O]nly a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile and, regarding a corporation, it is the place of incorporation and principal place of business. *Id.* (citation omitted). "[A] corporation's operations in a forum other than its formal place of incorporation or principal place of business will be so substantial and of such a nature as to render the corporation at home in that State only in exceptional cases." *Id.* at 139 n.19 (internal marks omitted). General jurisdiction does not exist in every state in which a corporation engages in a substantial, continuous, and systematic course of business. *See id.* at 137-38.

In deciding whether the case is one of the exceptional cases in which general jurisdiction is still proper, "[the court] must consider whether 'the corporation's activities in the forum closely approximate the activities that ordinarily characterize a corporation's place of incorporation or principal place of business.'" *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1318 (11th Cir. 2018) (citation omitted). On those principles, in *Waite*, the Eleventh Circuit found that the defendant manufacturer was not "at home" in Florida even where defendant was allegedly registered to do business in Florida, maintained an agent for service of process in Florida, hired a Florida distributor, had customers in Florida, and operated a plant in Brevard County, Florida. *Id.* at 1310, 1318. Similarly, in *Carmouche v. Tamborlee Management., Inc.*, 789 F.3d 1201, 1204 (11th Cir. 2015), the Eleventh Circuit found that general jurisdiction did not exist where the defendant non-resident corporation allegedly had two Florida addresses, had a Florida bank account, purchased insurance from Florida companies, filed a financing statement with the Florida Secretary of State, joined a non-profit trade organization based in Florida, and consented to the jurisdiction of the Southern District of Florida in its agreements.

In this case, Defendants' connections with Florida are far less pronounced than those considered by the Eleventh Circuit in *Waite* and *Carmouche*. All things considered, Plaintiff's allegations are centered on Defendants' email and telephonic communications with Plaintiff while she was in Florida; and beyond that, Defendants' alleged wrongful conduct pertain to their role and duties in D.C., and actions they took to frustrate Plaintiff's performance of the employment agreement, ultimately resulting in her termination. Importantly, the parties' agreement did not anticipate that any of Plaintiff's services would be rendered in Florida; Plaintiff was hired to teach at the University in D.C.

Moreover, federal courts have repeatedly held that "[e]vidence that a university recruits or admits students from the forum state, employs forum residents, receives revenue from the state in the form of tuition or fundraising, or has contacts with prospective students and alumni in the state is simply insufficient to support the exercise of general jurisdiction." *Am. Univ. Sys., Inc. v. Am. Univ.*, 858 F. Supp. 2d 705, 714 (N.D. Tex. 2012) (collecting cases); s*ee also Tobinick v. Novella*, No. 9:14-CV-80781, 2014 WL 7407500, at *3 (S.D. Fla. Sept. 25, 2014) (citing *American University* and finding that Yale University was not subject to general personal jurisdiction in the state of Florida). The Amended Complaint alleges so much less than the factors highlighted by *American University*. Based on the allegations, the Court concludes that Defendants do not fall within its general jurisdiction.

**B. Due Process**

"[T]he Due Process Clause 'imposes a more restrictive requirement' than does Florida's Long-Arm Statute." *Melgarejo*, 537 F. App'x at 860 (citation omitted). "Due process requires that the defendant have minimum contacts with the forum state and that the exercise of jurisdiction over the defendant does not offend traditional notions of fair play and substantial justice."

*Thompson*, 174 F. Supp. 3d at 1333 (citing *Mut. Serv. Ins. Co. v. Frit Indus., Inc.*, 358 F.3d 1312, 1319 (11th Cir. 2004)) (internal marks omitted). "[A]n individual's contract with an out-of-state party *alone* can[not] automatically establish sufficient minimum contacts in the other party's home forum." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985). When inspecting a contractual relationship for minimum contacts, courts follow a "highly realistic approach" that focuses on the substance of the transaction: prior negotiations, contemplated future consequences, the terms of the contract, and the actual course of dealing. *Id*. at 479; *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc*., 593 F.3d 1249, 1268 (11th Cir. 2010). In this analysis, "[t]he focus must always be on the nonresident defendant's conduct, that is, whether the defendant deliberately engaged in significant activities within a state or created continuing obligations with residents of the forum." *Diamond Crystal Brands, Inc.*, 593 F.3d at 1268.

On the one hand, though quickly terminated, the employment contract intended to create a continuing relationship between Plaintiff, a Florida resident, and the University. Also, the hiring process was partially done through telephone calls and emails to Plaintiff while she was in Florida. On the other hand, by its terms, the parties' performance was to be completed in D.C., the substance of the agreement pertained to Plaintiff's work at the University in D.C., and none of the Individual Defendants traveled to Florida. It was also Plaintiff who initiated the relationship by applying for a position at the University as opposed to the University initiating the contractual relationship in Florida. Further, as discussed earlier, there is no evidence or allegation that Defendants have had substantial, continuous and systematic contact with Florida. On these facts, the Court concludes that the University, let alone the Individual Defendants, do not have enough contact with Florida to justify jurisdiction here. To conclude otherwise would offend due process.

# IV.     JURISDICTIONAL DISCOVERY

On February 24, 2020, Plaintiff moved to conduct jurisdictional discovery. Jurisdictional discovery is warranted where jurisdictional facts are genuinely disputed. *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 730 n.7 (11th Cir. 1982) ("[If] the jurisdictional question is genuinely in dispute and the court cannot resolve the issue in the early stages of the litigation . . . [then] discovery will certainly be useful and may be essential to the revelation of facts necessary to decide the issue.") (citation omitted). Here, there is no genuine dispute about the jurisdictional facts to warrant jurisdictional discovery. *See Bernardele*, 608 F. Supp. 2d at 1321 ("[J]urisdictional discovery is favored where there is a genuine dispute concerning jurisdictional facts necessary to decide the question of personal jurisdiction; it is not an unconditional right that permits a plaintiff to seek facts that would ultimately not support a showing [of] personal jurisdiction.").

Further, Plaintiff is "foreclosed from pursuing jurisdictional discovery in an attempt to marshal facts that [s]he 'should have had — but did not — before coming through the courthouse doors.'" *Thompson*, 174 F. Supp. 3d at 1333 (citing *Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1216 (11th Cir. 2007)). In other words, "the purpose of jurisdictional discovery is to ascertain the truth of the allegations or facts underlying the assertion of personal jurisdiction. It is *not* a vehicle for a 'fishing expedition' in hopes that discovery will sustain the exercise of personal jurisdiction." *Atlantis Hydroponics, Inc. v. Int'l Growers Supply, Inc.*, 915 F. Supp. 2d 1365, 1380 (N.D. Ga. 2013) (citation omitted) (emphasis in original).

Additionally, upon reviewing Plaintiff's proposed "discovery requests," which are included in her Motion for Jurisdictional Discovery, the Court finds that Plaintiff has not made a showing that discovery would be relevant to the Court's jurisdictional analysis. Plaintiff's requests overwhelmingly pertain to the merits of the case and service of process, and not personal

jurisdiction. *See Atlantis Hydroponics, Inc.*, 915 F. Supp. 2d at 1379 (denying motion for jurisdictional discovery where jurisdictional facts were not dispute and the plaintiff made no showing that discovery would elucidate the facts necessary to prove personal jurisdiction). The very few requests that seek information on the University's recruiting events in Florida, student applications from Florida, and so on, are not material to the Court's consideration. Even if discovery shows that these connections exist in Florida, courts generally find that these types of activities are insufficient to establish personal jurisdiction over universities. *Tobinick*, 2014 WL 7407500, at *3 (citing *Am. Univ. Sys., Inc.*, 858 F. Supp. 2d at 714). *See also RMS Titanic, Inc. v. Kingsmen Creatives, Ltd.*, 579 F. App'x 779, 791 (11th Cir. 2014) ("Because the facts [plaintiff] sought would not have affected the district court's jurisdiction, it was not an abuse of discretion for the district court to deny the motion for jurisdictional discovery.") (citing *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1367-68 (11th Cir. 1997)).

Moreover, Plaintiff's request is untimely and granting it will only create unnecessary delay in the case. Plaintiff argues that she previously raised the issue of jurisdictional discovery in: (1) her thirty-page Motion to Stay and Vacate Orders [DE 35] and the reply [DE 50], which meandered through numerous arguments; and (2) an entry on the docket titled "First Request for Production" [DE 51], which is a document containing twenty-seven pages of communications between Plaintiff and Defendants and then one page of non-jurisdictional "Requests for Production."[5] First, to be clear, this is Plaintiff's first Motion for Jurisdictional Discovery. Her request is untimely. The brief discovery stay entered by the Court (for a month and half) expired on August 30, 2019. At

---

[5] Plaintiff requested documents and records showing: (1) the purpose and function of the University; (2) retainer agreements for the University's counsel and apparently the scope of representation in terms of service of process; (3) and the University's arrangement of legal representation for the Individual Defendants.

that point, the onus was on Plaintiff to promptly file this motion, or to move to compel documents specifically on the jurisdictional issue. *See Mazer*, 556 F.3d at 1280-81.

Concerning Plaintiff's argument that she raised the issue in other papers, the Eleventh Circuit has been clear that the burden is on the parties to *properly* seek jurisdictional discovery. *See Mazer*, 556 F.3d at 1280-81. In *Mazer*, the plaintiff argued that rather than dismissing the case for lack of personal jurisdiction over defendant, the district court should have deferred a ruling on the motion to dismiss and granted plaintiff's "requests" for jurisdictional discovery. *Id*. Rejecting that argument, the Eleventh Circuit noted that, despite recognizing the potential utility of jurisdictional discovery months in advance, the plaintiff "***never formally moved the district court for jurisdictional discovery but, instead, buried such requests in its briefs as a proposed alternative to dismissing*** . . . [the claims]." *Id*. (emphasis added). The court also noted that plaintiff delayed by several months before serving deposition notices and "failed to take any formal action to compel discovery or properly issue an . . . effective subpoena . . . ." *Id*. As a result, the Eleventh Circuit concluded that the district court did not err in dismissing the case because "[a]ll in all, [the plaintiff] should have taken every step possible to signal to the district court its immediate need for such discovery. . . [and yet] failed to take any of these reasonable steps to seek discovery." *Id*. (citation omitted). Here, Plaintiff made the same fatal mistakes, which cannot be remedied at this late hour. The Motion for Jurisdictional Discovery is denied.

## V.    MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

In deciding whether leave to amend should be granted, courts consider factors such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182

(1962). For any of these reasons, Plaintiff's motion for leave to file a second amended complaint is denied. In the order dismissing Plaintiff's Complaint, the Court specifically cautioned Plaintiff about filing a "shotgun pleading." *See* DE 7 at 3-4. Yet, Plaintiff's proposed Second Amended Complaint is exactly that. Each Count incorporates all factual allegations, thereby including in each Count irrelevant factual allegations and legal conclusions. The Counts also bunch together several causes of action or legally incognizable causes of action. *See Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1321-23 (11th Cir. 2015) (identifying categories of shogun pleadings); *Davis v. Coca–Cola Bottling Co. Consol.*, 516 F.3d 955, 979–80 (11th Cir. 2008) (condemning shotgun pleading that bunched together "untold causes of action" in one count); *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1279–80 (11th Cir. 2006) (noting that shotgun pleading fails to make the connection between "the substantive count and the factual predicates . . . [such that] courts cannot perform their gatekeeping function with regard to the averments of [the claim]."); *Pelletier v. Zweifel*, 921 F.2d 1465, 1517-18 (11th Cir. 1991) (describing shotgun pleadings as "replete with factual allegations that could not possibly be material to any of the causes of action they assert."); *Osahar v. U.S. Postal Service*, 297 Fed. App'x 863, 864 (11th Cir. 2008) (shotgun pleadings are "replete with factual allegations and rambling legal conclusions.") (citation omitted).

The proposed Second Amended Complaint also has several substantive deficiencies. For instance, regarding the new Title VII claims (Counts 9-13), Plaintiff has not alleged that administrative prerequisites to suit under Title VII have been met. *See Forehand v. Fla. State Hosp. at Chattahoochee*, 89 F.3d 1562, 1565 (11th Cir. 1996) ("A claimant is required to bring his or her action within ninety days of receiving a right-to-sue letter from the EEOC."). Additionally, Plaintiff's proposed amendments do not cure the jurisdictional deficiencies discussed in this Order.

Moreover, especially where the Court has already provided Plaintiff with the opportunity to amend her complaint, a second amendment at this juncture creates unnecessary delay and continues to subject Defendants to litigating in an improper forum. Plaintiff's request for leave to amend is denied.

## VI.  VENUE

### A.  Improper Venue

Defendants argue in the Motion to Dismiss that this Court is an improper venue under 28 U.S.C. § 1391.  Section 1391(b) provides that a civil action may be brought in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).  "Only the events that directly give rise to a claim are relevant.  And of the places where the events have taken place, only those locations hosting a 'substantial part' of the events are to be considered."  *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003). As alleged in the Amended Complaint, Defendants do not reside in this district but rather in the District of Columbia.   As discussed above, Defendants are not subject to personal jurisdiction in this Court.  Hence, subsections (b)(1) and (b)(3) are not met.

To decide if § 1391(b)(2) is applicable, the Court examines Plaintiff's claims.  Regarding Count 4, the breach of contract claim, there is no indication the contract was negotiated in Florida (or anywhere); rather, it was emailed to Plaintiff for signature while she was in Florida.  Then, the agreement was intended to be performed solely in D.C., where Plaintiff would work at the University as a professor.  Most importantly, the contract was allegedly breached by the

Defendants because of conduct that occurred in D.C. *See Bremer*, 321 F.3d at 1372 (noting that the most important consideration is the breach of the contract and where it occurred). Under these facts, the Court concludes that substantial events giving rise to her claim occurred in D.C., not Florida. Concerning Plaintiff's tort claims based on Defendants' alleged negligence, conspiracy, and vicarious liability, the Amended Complaint indicates that any facts that may give rise to those claims substantially pertain to events and conduct of the Defendants in D.C. Hence, § 1391(b)(2) is also not met and venue is improper.

## B. Transfer of Venue

"In this Circuit, a court lacking personal jurisdiction of the defendant may transfer the case under either [§] 1404(a) or [§] 1406(a)." *Roofing & Sheet Metal Servs., Inc. v. La Quinta Motor Inns, Inc.*, 689 F.2d 982, 992 n.16 (11th Cir. 1982). Having determined that venue is improper in this District, the Court now determines whether dismissal or transfer is appropriate. Section 1406 provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406. The decision whether to transfer a case is left to the sound discretion of the district court. *Roofing & Sheet Metal Servs.*, 689 F.2d at 985.

This Court finds that it is in the interest of justice to transfer — as opposed to dismiss — this case because transfer "would save the parties the time and expense of beginning again from scratch, avoiding delay and wasteful duplication of effort." *Organic Mattresses, Inc. v. Envtl. Res. Outlet, Inc.*, No. 17-21905-CIV, 2017 WL 5665354, at *13 (S.D. Fla. Oct. 6, 2017), *report and recommendation adopted sub nom. Organic Mattresses, Inc. v. Envtl. Res. Outlet, Inc.*, No. 17-21905, 2017 WL 5665356 (S.D. Fla. Oct. 24, 2017) (citation omitted). Defendants reside in the

District of Columbia and this action could have been brought in the District of Columbia. The District of Columbia is the proper venue for Plaintiff's claims. Accordingly, it is

**ORDERED** that:

1) Defendants' Motion to Dismiss Plaintiff's Amended Complaint [DE 28] is **GRANTED** to the extent the Court finds that it lacks personal jurisdiction over Defendants and that venue is improper. Rather than dismiss the case, in the interest of justice, the Court directs the Clerk to **TRANSFER** this action to the United States District Court for the District of Columbia pursuant to 28 U.S.C. §§ 88 and 1406(a);

2) The Individual Defendants' Motion to Vacate Entry of Default [DE 26] is **GRANTED**;

3) Plaintiff's Motion for Leave to Conduct Jurisdictional and Service Discovery [DE 56] is **DENIED**;

4) Plaintiff's Motion for Leave to Amend Complaint [DE 64] is **DENIED**;

5) All other pending motions not ruled on are **DENIED AS MOOT**;

6) This case is **CLOSED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 25th day of March 2020.

**RODNEY SMITH**
**UNITED STATES DISTRICT JUDGE**

cc: All parties of record